18-1428 Power Analytics Corporation v. Operation Technology, Inc. May it please the Court. Two points in response to the argument by counsel. One is that Mr. Vandenberg, I want to ask you a question. The specification of 608 says, design and production processes have benefited greatly from ELIPSIS computer simulation techniques and such techniques are relatively well developed, but they have not been applied in real time, e.g., for real time operational monitoring and management. Doesn't this contend that the elements of the asserted claims do not recite matters well understood routine or conventional to a personal skill? No, Your Honor. We submit that what it is contending is that the abstract idea itself, the concept of prediction deviation from real world, it's submitting that that's innovative and that's useful and for purposes of this case we can concede that. The key, I would invite the Court's attention if I may. Do you concede the real time element of that? That is part to update in response to prediction deviations that is as part of, based on real time data, yes, that was also done, that was done in electric power. I invite the Court's attention, time permitting, to the electric power claims. But the focus of the invention here we know from the power analytics, and it's very unlike what we've heard today, and that I think the specification, if I could invite the Court's attention to Appendix 1685 is what power analytics told the District Court was the focus of their invention. And at 1685, at line 19, this is the first page of their opposition to our motion for summary judgment. So again, 1685, line 19, quote, In the asserted patents, the collection of real time data is a relatively minor, but necessary, element of the inventions that focus on the use of that data to calibrate and or synchronize the model of the virtual electrical system and use the new values to generate new calculations for the virtual system model. That is a data solution to a data problem. The data problem there was that prediction models, they called it virtual system models, same thing, got out of date. The solution was to update the model when the deviation from the real world exceeded a certain threshold. The power analytics in this brief, in their opposition, was fairly consistent that that was the focus. Step one. So turn three pages to 1688, where the power analytics described the limitations of prior art and how the asserted claims overcame these many disadvantages through employment of the power analytics server. And they explained that the patents ensued solved problems and provided system operations with functionality that did not exist previously. And three, stated that prior to the inventions recited in the patents ensued, that is the virtual system model and its employment to assess electrical system status, prior art, quote, did not incorporate real time data and their accuracy was compromised as a result. Doesn't that convey the contention that the elements of the asserted claims don't recite matters which are well understood, routine or conventional to a person of skill? Yes, Your Honor, but only with respect to what the district court correctly found as being the abstract idea. On the page that Your Honor cites on 1688 at the bottom, we see at line 23 to 24, when the differences between the electrical system's current status and the virtual system model's calculated outputs exceed a threshold, the inventions initiate a calibration and synchronization operation. So that is saying the same thing that I quoted earlier, the same thing the trial court said. Correct, but what I'm saying is that both in the patents and in their opposition, they said what they said was inventive was the subject matter of Step 1. They did not, as a matter of law, distinguish Step 1 and Step 2. They conflated it and for an inventive concept in Step 2, they went back to the abstract idea. They said no one before has updated the prediction model when there was a deviation of threshold and that, of course, is irrelevant under the law. What they don't do is to, say, come up with any unusual or new way of doing that. That's correct. They don't describe how to do it other than to use these generic devices. That's correct, Your Honor, and if I may invite the Court's attention to Volume 1 of the appendix, which is the specification, and I would start at Appendix 77. So this is Appendix 77, it's Column 8 of the 608 patent. And at Column 8, Lines 21 to 24, a variety of conventional virtual model applications can be used for creating a virtual system model. So the patent specification admits there the invention is not having a virtual system model or software for creating a model, etc. Then at Appendix 80, this is Specification Column 13, Line 39, they admit the sensors are conventional. Quote, the monitored system can be any combination of components whose operations can be monitored with conventional sensors. So there is no new data here. The patent doesn't say we've come up with some new sensor to detect some new electrical property of the system. The data is old. The sensors are old. The data acquisition hub is old. Servers were old. The client terminal was old. The displays were old. All of the equipment was old. Nor does the specification suggest, unlike BASCOM, cases like that with distributed archiving. Could it be done in real-time before this? Yes, Your Honor, and one evidence we have of that is electrical power system claims refer to real-time data collection being collected, refers to prediction data, refers to updating the composite indicator that Judge Chen referenced earlier. And I'll point to that in a moment. If I may just finish with the patent in suit, the 608, inviting the Court's attention to Appendix 94. Appendix 94, Column 41, at Line 33, they're admitting that essentially this can be done with any type of computer system. So Line 33, quote, the embodiments described herein can be practiced with other computer system configurations, including handheld devices, dot, dot, dot, mainframe computers, and the like. The embodiments can also be practiced in distributing computing environments where tasks are performed by remote processing devices that are linked through a network. But the claims don't require that. That's simply an embodiment.  And then finally, on this point, at Column 41, same column, Appendix 94, Lines 58 to 59, quote, in particular, various general-purpose machines may be used. So very consistent in the specification. All of the hardware, all the combination of hardware is known. And then if I can compare that to electric power at Appendix 945. Because, look, I think the only issue you have is step two and whether a person of skill would say what they assert is the real-time nature is new. And that might be a question of fact to try. So show me why it isn't. Well, two reasons. One is procedural. So we moved for summary judgment, and per the local rules, we said there is no material dispute as to any genuine dispute as to any material fact. In the local rules, they needed to come back and say otherwise. They needed to identify material facts that were genuinely disputed. That's important. They cited none. They cited none. In their opposition brief, they pointed to no material fact that was genuinely disputed. In the argument, same. Now on appeal, they said, well, we couldn't have because Berkheimer came out later as we've briefed. Well, I'm not sure we briefed because that was the gray brief. They said that. Berkheimer cites Mortgage Grader. Mortgage Grader was in 2016 before our motion. Mortgage Grader cites Accenture in 2013. Both Mortgage Grader and Accenture were summary judgment cases. Both said that step two can raise questions of fact. Power Analytics, if they thought there was a fact question, could have and should have, and the trial court was entitled to rely on their failure. I don't think that's new law. Right, and Judge Kronstadt was certainly entitled to rely on the local rules, and in his opinion, he said the facts were not disputed. What's your second point? Second point is substantively the real-time aspect could arise from two things. One, you have some better hardware that is now able to do real-time, which they don't. They admit conventional, or it could be simply the idea. It's like, oh, let's update the prediction model as soon as possible. That, we submit, would be part of the abstract idea. Going back to Kepler, we analogize the Kepler because the problem of the model that let's speak maybe hypothetically, maybe not. If you organize the system in a fashion such, all the old components, but all of a sudden it updates because it's drawing from fewer sensors and able to analyze differently. It updates everything faster and recognizes problems faster. Wouldn't you agree that that's at least a question of fact? If the claims recited some new configuration of software, recited that somehow you have fewer sensors, I could conceive a claim like that that had it been preserved, could have perhaps step two raised it. But you say it's not in there. No, it's certainly not in the claims. It's not in the specification. The column one, the column two, the one that counsel referred to, does not say there are fewer sensors, nor is the rest of what was cited. If I may refer to appendix 945, appendix 945 is the bulk of claim 12 from electric power group. At column 31, electric power group claim talks about and recites calculating and updating new data as part of its data solution. Power analytics has said electric power group had no new data. This is new data. Column 31, line 21. Our opinion in electric power said there was no new data. Different aspects of new data. Not new data that was being created and input to the algorithm. Agreed. No new data like that. What I'm talking about is the output. What is output is a new analysis. So, for instance, at column 31, line 21, it says, quote, dynamic stability metrics derived from analysis of the measurements from the data streams. So part of the method is you get the input data, old data, and you create these dynamic stability metrics. At line 35 of column 31, it refers to prediction data. The same we have here. At line 41 of column 31, it says, dot, dot, dot, the dynamic stability metrics, dot, dot, dot, in real time. In real time. Electric power system received information from sensors. Could have been the same sensors this pat was talking about. Claims also talk about how the data streams are collected in real time and then detecting and analyzing events in real time. Yes. And then finally, as Judge Chen referenced earlier at line 45, deriving a composite indicator of reliability that is an indicator of power grid vulnerability. That is a prediction model. This was used to prevent blackouts, allow an operator to look at some screen and see some indicator that you have a reliability problem. So, Your Honor, we submit that this case can be decided on stare decisis, that both this patent's claims and the electric power system claims are directed to a data solution, to a data problem, and use generic hardware. And therefore, I ask the court to affirm the district court. Just a hypothetical. The principle you're espousing, a data solution to a data problem, that sounds really broad and could eat into a lot of things. Like, for example, some kind of system for predicting the path of a hurricane, where with each passing day, you want to try to figure out if this hurricane is going to hit New York. And with each passing day, you get better and better information, because the hurricane's on the move, and then you can alter the model for figuring out, is it going to hit New York or maybe just Jersey? So, we need to figure this out. And so, there are big data solutions out there that seem to be very valuable, and so therefore, you would think, instinctively, it ought to be part of the patent system. So, when you say data solutions to data problems are not patent eligible, I wonder if things like my hypothetical get swept into that. Your Honor, to be more precise, the line that we would suggest is, it's a distinction between improving an information-based aspect of what's essentially a mental task on the one hand, which I would say... You'd agree that a novel way of hurricane prediction would be patentable, right? Well, I'd like to go to the distinction between Benson and Fluke on the one hand versus Deere. If this technique is simply a new algorithm that allows you to take data that's already been collected, and the algorithm somehow gets more accurate results, then I would suggest probably not patent eligible. However, if it's more like Deere, where there is a functional relationship between the mental aspect and some physical data collection, like the thermocouple in the mold, that would be patentable. I guess we don't need to decide that. No, and there's no need in this case for sure. This is so close to electric power group that one need not define the exact line between Benson and Fluke on the one hand and Deere on the other hand for this case. Okay. Thank you, Mr. Vandenberg. Thank you. Mr. Roy, do you have two minutes? All right. I have your citation for the sensors. It is in appendix 90, lines 33, 1 through 5, where it clearly states in the specification, it's not feasible to fully sensor out an electrical system at all possible locations, due to cost and physical accessibility limitations. Therefore, there's a need for techniques that predict through real-time simulation the sources of harmonic distortions within the electrical system. So that's really the point of this. Secondly... Well, where's that in the claims? It's in the claims. Well, it's in the specification. You have to read the claims in light of the specification. Where is it in the claims? It says in the claims, A, meaning one or more sensors to get the real-time information. But you have to read that in light of the specification that says that we're not censoring the entire system. But that's not the major point. The major point here is that what Judge Wallach said is that this is different. And it's like the hurricane system. This is not preempting the world. We have a very specific set of machines and software programs that limit our invention to the specific elements here. And those elements are the inventive elements of the calibration and synchronization. Those aren't found anywhere else. And they were not in the prior art. And you read the specifications very explicitly. That just getting real-time data is important. And not having to censor the whole system is important. But getting that data and doing the right thing with it, which is comparing it to the old data so that you can see changes in the system. And then recalibrating that model so that that model knows what the system is actually doing. And synchronizing that data so an operator gets a picture of something that may happen with the system. That's very specific. It is not electric power. None of those specifics were there. Okay. Thank you, Mr. Rock. We're out of time. Thank both counsel. The case is submitted. That concludes our session for this morning.